612 So.2d 168 (1992)
Arnez Gene LINER
v.
TERREBONNE PARISH CONSOLIDATED GOVERNMENT, Terrebonne Parish Fire Protection District # 10 and Cigna.
No. 91 CA 2184.
Court of Appeal of Louisiana, First Circuit.
December 23, 1992.
Michael P. Pellegrin, Houma, for plaintiff and appellant, Arnez Gene Liner.
Temple A. Stephen, New Orleans, for defendants and appellee, Terrebonne Parish Consol. Government, et al.
Before CARTER, LeBLANC, JJ., and CHIASSON[*], J. Pro Tem.
LeBLANC, Judge.
In this personal injury case, plaintiff, Arnez Gene Liner, appeals the portion of the trial court's judgment attributing fifty (50%) percent of the fault for his accident to him, and reducing his recovery accordingly. After a thorough review of the record, we find that the trial court's allocation of fault is supported by the evidence and is not clearly wrong. Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La.1985). See attached reasons for judgment.
Costs of this appeal are assessed against plaintiff, Arnez Liner.
AFFIRMED.
ATTACHMENT

Arnez Gene Liner

vs. No. 97,717

Terrebonne Parish Consolidated Government, Terrebonne Parish Fire Protection District # 10 and Cigna

32ND JUDICIAL DISTRICT COURT

PARISH OF TERREBONNE

State of Louisiana

REASONS FOR JUDGMENT
In this personal injury case, plaintiff, Arnez Gene Liner, seeks compensatory damages from Terrebonne Parish Consolidated Government, Terrebonne Parish Fire Protection District No. 10, and CIGNA for injuries he received when he fell off of a fire truck during a Mardi Gras parade February 17, 1990. Trial on the matter was held May 6 and 7, 1991.
At the time of the accident, Liner, a volunteer fireman, was situated on top of the truck in a squatting position. He was given permission to ride on the truck by Ralph Liner, a volunteer fireman who was driving the truck. Ralph Liner conceded *169 that he observed plaintiff several times sitting on his feet and thought that position was alright. The accident happened when Liner rose up about 8 or 9 inches to throw a strand of beads to his godmother. As he was resting one hand on what is called a "pike pole," the pole gave way and he and the pole fell to the ground. Plaintiff broke both his arm and hip as a result of that fall, which he claimed was precipitated when the truck lurched forward from a still position.
Plaintiff testified he thought the pole was a railing. He stated he was never instructed on the use of a pike pole although he did see it in films. He also stated he was never shown on the truck where the pole was located. He conceded, however, that he was told the pole was emergency equipment and that as such, it should be easily accessible (the pole easily pops out of two prongs on either end). As a volunteer fireman for four years, plaintiff handled mainly grass fires, to which he would drive his own vehicle. His duties comprised primarily hooking up hoses.
Ralph Liner, Melvin Malbrough, and Randy Liner all testified that as volunteer firemen, they had either ridden on the truck themselves in previous parades or had seen other firemen riding the truck. No one, however, is allowed to ride on the outside of the truck during an emergency response. Ralph Liner stated he attended a few classes on the use of a pike pole and that a fireman should be expected to know the function of a pike pole and how to use it. He said he had never seen plaintiff use the pole. Randy Liner stated the pole is seldom used. Barry Brunet, a volunteer fireman over five years, and with 200 hours of training, said he would expect a volunteer fireman to know the function of a pike pole.
While it is true that plaintiff should not have relied on the pole as a railing, it was also negligent of the department to allow such use of the truck. The pole was not used often and plaintiff was never given hands-on experience with the pole, whereby he would have seen how easily the pole came loose from its holders. The pole looks like a railing and it is foreseeable that someone with plaintiff's limited training (a few classes) and intelligence (I.Q. of 76) would mistake the pole for a railing. If the department planned to use the truck in such a manner it should have formulated certain rules to ensure greater security for such persons, as plaintiff, riding on top of the truck. Therefore, this Court is of the opinion that the department and the plaintiff were equally at fault in causing the accident and thus casts each with 50 percent of the judgment.

DAMAGES
Plaintiff sustained a broken left arm and elbow, and left hip. A cast was placed on his arm and he remained in a wheelchair for about 2½ months. More surgery was performed later whereby an external fixation was put on his left arm for three months. It was not until April of 1990 that he was allowed to place any weight on his leg by using a cane. In June the doctor allowed him to use his cane outside of the house and go fishing. The doctor also removed the external fixation from plaintiff's left arm at that time. In September of 1990 (approximately six months after the accident), his doctor, Dr. Gary Guidry, released him for light duty work. Until then, he did not use his left arm.
Plaintiff testified that he still has pain when the weather changes. Dr. Guidry attested that plaintiff should not lift anything over 50 pounds, under any circumstances; on a regular basis he should not lift anything over 25 pounds or carry anything over 34 pounds on his hip. He should also not do any climbing where he would have to use his arm. Dr. Guidry assigned him a 5 percent disability of his left lower extremity and 20 percent of his left arm. For these reasons, the Court awards plaintiff, who was 24 at the time of the accident, $75,000.00 for past and future pain and suffering.
As of the date of trial, plaintiff's medical bills had amounted to $38,546.04. Inasmuch as plaintiff, in his post-trial memo, did not ask for future medical expenses nor *170 offered evidence indicating the amount of such expenses, this Court will award only past medical expenses in the amount of $38,546.04.
As of the time of trial, plaintiff had returned to work as a fishing boat operator. Prior to the accident, he was a tacker or welder's helper and also trawled. He testified the most he ever made was $5.50 per hour. Tax returns showed plaintiff made $4,587.89 in 1986; $1,666.00 in 1987; $1,286.00 in 1988 and $9,764.00 in 1989. For about a month in 1990, his W-2 form shows he earned $64.50.
Dr. Craig Feldbaum, plaintiff's rehabilitation psychologist, testified that plaintiff can no longer fish for crabs. Todd Capielano, defendants' expert, testified that plaintiff can no longer do tacking or welding work. Feldbaum proposed that plaintiff could be trained as a cashier or a store clerk. He could also clean carburetors, earning $4.25 to $5.00 per hour. Capeilano suggested private security work, parking lot work, driving a truck for a dry cleaner or being a punch press operator. Those jobs pay anywhere from $4.25 per hour to $7.25 per hour.
Randy Rice, plaintiff's economist, estimated that plaintiff had lost $13,885.00 in past wages, based on $5.50 per hour. Future lost wages, for a remaining work life of 30.85 years, according to Rice, should come to $232,496.00, less $179,656.00 in minimum wages plaintiff could earn, and discounted at 8 percent, but less a 5 percent future growth factor, resulting in $52,840.00 in future lost wages. Under cross examination, however, Rice testified that if future lost wages were based on plaintiff's tax returns, the loss would only be about $2,032.00.
Dan Cliffe, defendant's expert economist, testified that plaintiff would not suffer any future lost wages. Past lost wages, according to Cliffe, would amount to $2,216 based on the tax return showing $8,942.00, less what plaintiff could have earned in minimum wages.
Having reviewed the above findings, this Court is of the opinion that, plaintiff suffered $13,336.40 in past lost wages and will suffer $36,215.14 in future lost wages (using a 6-percent discount rate and plaintiff's ability to earn minimum wage).
Judgment will be rendered accordingly.
Signed, Houma, Louisiana, this 23 day of August, 1991.
/s/ Paul R. Wimbish PAUL R. WIMBISH District Judge Division "E"
NOTES
[*] Judge Remy Chiasson, retired, serving as judge pro-tempore by appointment of the Louisiana Supreme Court.