669 So.2d 451 (1995)
Theda M. DAWSON
v.
CITY OF BOGALUSA, et al.
No. 95 CA 0824.
Court of Appeal of Louisiana, First Circuit.
December 15, 1995.
Rehearing Denied March 29, 1996.
*452 William M. Magee, Covington, for Plaintiff-Appellant.
Michael J. Paduda, Jr., Sondra A. Cheek, Bogalusa, for Defendant-Appellee.
Before SHORTESS, PARRO and KUHN, JJ.
SHORTESS, Judge.
Theda M. Dawson (plaintiff) lives on Seventh Street in Bogalusa. Her front yard is enclosed by a fence, and her driveway is secured with a gate. On July 24, 1992, plaintiff moved her car across the street to rake the area outside the fence. When she completed raking, she moved the car partially into her driveway and got out to open the gate. Plaintiff was exiting the car, when she stepped in a pothole at the edge of Seventh Street, injuring her right knee and ankle.
Plaintiff sued the City of Bogalusa (defendant), alleging the pothole was an unreasonably dangerous condition in a city-owned right-of-way. After a bench trial, the trial court dismissed plaintiff's suit, finding plaintiff failed to show defendant had actual or constructive notice of the pothole as required by Louisiana Revised Statute 9:2800.[1] Plaintiff appeals.

NOTICE
Plaintiff and her neighbor, Waldron Maddock, both testified the pothole existed for quite some time before the accident. Plaintiff testified the hole existed three to four weeks before she began making telephone calls to defendant complaining about the hole. Her complaints continued for several months. Maddock testified there have been holes along Seventh Street, including the hole in which plaintiff fell, for years before this accident.
According to plaintiff's testimony, she called the city department of public works about the hole, talked to a young lady in that department in person, and also complained about the hole when she paid her water bill. She stated she talked to Cornelius "Marvin" Austin, the city council member for her district, three times, to no avail. Finally she called Mary Boulware, a council member at-large, in February 1992.
Boulware denied plaintiff complained to her about a pothole. She did, however, turn in a work order on February 7, 1992, to the public works department to clean the ditch in *453 front of plaintiff's home. Her notes reflect plaintiff complained water accumulated in the ditch up to her ankles, and it aggravated plaintiff's arthritis to walk through the water. However, there is no ditch in front of plaintiff's home.
The work order form has a section where comments regarding the complaint and the disposition thereof are to be noted. Once this portion of the form is completed, ordinarily it is returned to the city council member who requested the work. Boulware never received a completed form in this case.
Plaintiff produced a number of witnesses affiliated with defendant who testified defendant often takes months to respond to complaints, if it responds at all. Bobbie Cochran, the public works manager at the time of the accident, testified it sometimes takes months to check on complaints. Austin stated work orders "have been known to get lost in Public Works." Boulware testified it was not unusual that she did not receive the completed work request form because "a lot of times they might be unable to get to something...." Mervin E. Taylor, Jr., the mayor, stated potholes are repaired in a timely fashion, but larger projects, such as drainage problems or tree cutting, may take three or four months.
Plaintiff's and Maddock's testimony that the hole existed for a considerable period of time before the accident is undisputed. Furthermore, although defendant denies plaintiff ever complained to one of its representatives about a pothole before the accident, defendant admitted it was aware five and one-half months before the accident there was some sort of problem in front of plaintiff's home. Billy Daniels, defendant's director of public works, testified the same supervisor is in charge of both potholes and ditch problems. Austin, a former public works department employee, testified had he been working for the department and seen the pothole, he would have either repaired it himself or reported it.
The trial court specifically addressed the question of actual notice and found none, but it failed to discuss constructive notice. Constructive notice means the existence of facts which infer actual knowledge. La.R.S. 9:2800(C); Boddie v. State, 27,313, p. 6 (La.App. 2d Cir. 9/27/95), 661 So.2d 617, 622. A municipal authority is deemed to have constructive notice if a defect existed for such a period of time that by the exercise of ordinary care and diligence it must have known of its existence; additionally, the municipal authority must have had reasonable opportunity to guard the public from the injury by remedying the defect, but it failed to do so. Morris v. State, 94-2545, p. 6 (La.App. 1st Cir. 10/6/95), 664 So.2d 1192. Based on the length of time the pothole existed and defendant's knowledge of some type of problem in front of plaintiff's home, the trial court was clearly wrong in finding plaintiff failed to show defendant had constructive notice.
The trial court was also legally wrong in dismissing plaintiff's suit for failure to prove notice. After the trial court's judgment was rendered, this court decided Rhodes v. State, 94-1758 (La.App. 1st Cir. 5/5/95), 656 So.2d 650, holding the notice requirement of Revised Statute 9:2800 is unconstitutional because it violates the state's abrogation of sovereign immunity. Rhodes, 94-1758, p. 15, 656 So.2d at 662. Thus, failure to prove notice is no longer a sound legal basis for dismissal of a claim against a governmental entity for a cause of action based solely upon liability imposed under Civil Code article 2317.
The factual and legal errors of the trial court regarding notice have so tainted the trial court's judgment that we must conduct a de novo review of the record and make our own determination of plaintiff's claims. Defendant does not dispute that an unreasonably dangerous condition existed on property over which defendant had the garde. The issue of notice has been resolved above. The two issues remaining for our determination are whether plaintiff's fault contributed to her injuries and the amount of damages which will adequately compensate her.

COMPARATIVE FAULT
In Watson v. State Farm Fire & Casualty Insurance Company, 469 So.2d 967, 974 (La.1985), the supreme court set forth *454 five factors which may influence the degree of fault assigned: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
This accident occurred at dusk, about 8:00 p.m. The day was dry, and nothing obscured the hole. Plaintiff admitted she was well aware of the pothole, she would have seen it if she had looked down, and the accident definitely would not have happened had she looked. She gave no explanation for failing to see the hole.
Defendant's only excuse for failing to repair the pothole was that it did not know the hole existed. Had defendant investigated plaintiff's complaint, however, it would have known of the problem. Defendant had the capability to correct the problem, and it must have been aware of the risks of motor vehicle and pedestrian accidents created by potholes. However, the testimony of defendant's employees established defendant was somewhat lackadaisical in responding to citizen complaints.
Here, the most important Watson factor in assigning fault is the relative abilities of the parties to avoid the accident. If we accept plaintiff's testimony that she notified defendant's representatives several times of the defect, we must consider this pothole was, to defendant, just one problem of many it needed to correct. Plaintiff, however, was acutely aware of this pothole at the end of her driveway, and she admitted she could easily have avoided the accident had she looked before she stepped. Thus, plaintiff was clearly in a superior position to avoid the accident.
Considering all of the Watson factors as applied to the facts of this case, we assign fault 75% to plaintiff and 25% to defendant.

QUANTUM
Approximately one year before this accident, plaintiff was diagnosed with early degenerative arthritis of her right knee. She was treated for this condition in the emergency room of Bogalusa Community Medical Center (BCMC) in July 1991. She testified that after one cortisone injection she had no more problems until her fall. Five days before the accident she was treated at the emergency room at BCMC for an anxiety attack. The patient history shown on the BCMC outpatient record lists a torn ligament of the right knee. Plaintiff denied providing that information to the hospital staff, and there is no other evidence to support it. She testified that before this accident she had no medical problems affecting her ability to "get around."
After the accident plaintiff was taken to the BCMC emergency room by ambulance, where she was treated for a contusion to the right knee and released. She returned to the emergency room six weeks later complaining of pain and swelling in her right ankle which she had had since the accident. She was diagnosed with a severe right ankle sprain and was placed in a splint, which she wore two to three weeks. She then saw Dr. Paul M. Doty, an orthopedic surgeon. Plaintiff has had chronic pain in her right ankle since the accident, but Doty stated there is nothing further he can do for it other than prescribe anti-inflammatory medications. Doty testified the accident also caused a nerve injury between plaintiff's toes. This condition sometimes responds to injections or surgery.
The accident also aggravated the degenerative problems in plaintiff's right knee joint. Arthroscopic surgery in August 1993 revealed a tear of the posterior horn of the knee cartilage. Doty has treated plaintiff with anti-inflammatory medications and steroid injections, but he stated she will need knee replacement surgery within the next one to five years.
Knee replacement surgery will require a week of hospitalization, a month of rehabilitation while plaintiff uses a walker, and then a month of using a cane. She will require physical therapy daily for two weeks, then every other day for two more weeks.
Doty testified plaintiff has suffered a permanent partial disability as a result of the *455 accident. He assigned a disability of 40% to plaintiff's right leg, including 25% to the knee and 15% to the ankle.
Plaintiff is a nurses' aide for the Bogalusa Mental Health Clinic. She performs home visits and assists with group therapy. She has worked in that job for twenty-four years. At the time of the accident she was sixty-four years old and close to retirement.
Plaintiff's major concern following the accident was working long enough to qualify for a pension. She testified that if she works ten months longer her pension will increase by 8%. Dr. Alan J. Coe, plaintiff's treating psychiatrist, stated plaintiff is "most concerned" whether she will be able to qualify for her pension. Doty testified plaintiff's continued work is aggravating her condition, but reaching retirement is "very foremost in her mind." Doty stated he keeps "patching her up ... and keeping her going so she can retire." She has not been able to work a full week since the accident and has used 847.5 hours of sick leave.
Plaintiff's neighbor, Waldron Maddock, testified the accident has affected plaintiff's activities and the way she carries herself. Maddock stated before the accident plaintiff had a "very proud graceful walk" and was a "very proud stepper" who usually wore high heels to work. Now plaintiff "just kind of drags along," according to Maddock. Plaintiff testified she now wears special shoes, and Doty stated she was walking with crutches when she saw him in February 1994.
Plaintiff was active in her church and enjoyed working in her yard before the accident. Now her church activities are limited, and the only yard work she can do is light raking.
Plaintiff stated she is very depressed and has crying spells. Coe diagnosed her with major depression and a generalized anxiety disorder. He suspected she was anxious and depressed before the accident, but the accident has exacerbated her problems.
In light of the injuries, both physical and mental, suffered by plaintiff as a result of this accident, we find the sum of $110,000.00 is adequate to compensate her for her general damages. Plaintiff is also entitled to reimbursement for sick leave taken since the accident, the value of which totals $7,143.49[2], past medical expenses of $13,685.67, and future medical expenses. Doty testified his fee for the knee replacement surgery would be $4,500.00. His "ballpark figure" for the hospital cost was $24,000.00, and he estimated physical therapy would cost $2,500.00 to $2,800.00. We find the sum of $31,000.00 will adequately compensate plaintiff for future medical expenses. Of course, all of these figures must be reduced by the percentage of fault assigned to plaintiff.

CONCLUSION
For the foregoing reasons, the judgment of the trial court dismissing plaintiff's suit is reversed, and judgment is rendered in favor of plaintiff, Theda M. Dawson, and against defendant, the City of Bogalusa, in the sum of $40,457.29, which is the total of general damages of $110,000.00 and special damages of $51,829.16, reduced by 75%. Defendant is cast with all trial and appeal costs, which total $2,067.70.
REVERSED AND RENDERED.
NOTES
[1] Plaintiff also sued the Louisiana Insurance Guaranty Association (LIGA), the statutory successor to Magnolia Fire and Casualty Insurance Company, Bogalusa's insurer. LIGA is not named in the judgment.
[2] Plaintiff used 847.5 hours of sick leave. Her hourly wage is $8.4289.