755 So.2d 1039 (2000)
William W. KOSE & Sonja June Kose, Plaintiffs-Appellees,
v.
CABLEVISION OF SHREVEPORT, American Television and Communications Corp., and Aetna Company, Defendants-Appellants.
No. 32,855-CA.
Court of Appeal of Louisiana, Second Circuit.
April 5, 2000.
*1043 Ungarino & Eckert by Matthew J. Ungarino, Metairie, Counsel for Appellants.
John T. Bennett, Marksville, Counsel for Appellees.
Before BROWN, GASKINS and KOSTELKA, JJ.
GASKINS, Judge.
The defendants, Cablevision of Shreveport, American Television & Communications Corporation, (Cablevision) and its insurer, Aetna Insurance Company, appeal a jury verdict, denial of judgment notwithstanding the verdict, and motion for new trial, awarding the plaintiffs, William W. Kose and Sonja June Kose $1,300,000.00 in damages for injuries sustained when the motorcycle on which Mr. Kose was riding became entangled in a loose cable. We affirm in part and amend in part the jury award and trial court judgment.

FACTS
On April 26, 1995, at approximately 11:00 a.m., Mr. Kose drove his truck down Jefferson Paige Road, from his boat repair shop to his home, to retrieve his motorcycle. This portion of the journey occurred without mishap. Sometime after Mr. Kose passed the site of the accident, a hook holding a Cablevision cable to a pole broke and the cable dangled into the roadway. On the return trip at approximately 11:35 a.m., Mr. Kose's motorcycle became entangled in the Cablevision cable. He lost control and crashed the motorcycle.
Mr. Kose was severely injured, fracturing his collarbone and elbow. He also injured his knee and sustained neck and back injuries. After accompanying his wrecked cycle to the repair shop, the plaintiff was taken to the hospital where he spent one night. Following a number of failed attempts to reduce the elbow fracture, Mr. Kose underwent surgery to install pins in the elbow. One year later, after the fracture healed, he again had surgery to remove the pins. Mr. Kose also had arthroscopic surgery on his knee. Mr. Kose had a prior back injury and had some protruding discs at the C5-6 and C6-7 levels.
Mr. Kose owned and operated a small boat and jet ski repair service. After this accident, he required an assistant to help him in his work. He and his wife filed suit against Cablevision and Aetna to recover for general damages, past and future medical expenses, and loss of consortium. The suit was originally filed in Orleans Parish, where Cablevision has its agent for service of process. However, the defendants were able to have the matter transferred to Caddo Parish on a motion of forum non conveniens.
The case was tried before a jury from November 30 to December 3, 1998. The evidence showed that on the date in question, the Cablevision cable was not dangling in the roadway when Mr. Kose went home at 11:00 a.m. However, shortly before the accident occurred, something hit *1044 the windshield of a passing motorist, Mr. Thomas Edward O'Connor, leaving a black smudge mark on his windshield. The plaintiffs contend that the cable was hanging too low and hit Mr. O'Connor's car, breaking the cable loose from one post. Mr. O'Connor turned around and drove back to the scene to see what had struck his windshield. He arrived back at the scene at about the time Mr. Kose crashed his motorcycle.
Also at about the time Mr. O'Connor first passed through the area, a bicyclist, Christopher Cobb, saw the cable dangling and dismounted from his bicycle. He intended to remove the cable from the road, but some dogs began chasing him. While Mr. Cobb was fighting off the dogs, Mr. Kose rode by on his motorcycle and became entangled in the cable. William Troy Klingensmith, a resident living in the area who owned the dogs, heard the crash and called the paramedics.
The defendants sought to prove that the P or J hook holding the cable to the pole showed signs that it had been hit by an outside force, dislodging it. According to the defendants, there was a trailer park down Jefferson Paige Road and mobile homes were frequently transported on the roadway. The defendants argued that a trailer or mobile home must have been brought down the road, dislodging the cable. However, no proof was offered that this actually occurred. Residents in the area did not report seeing a trailer brought down the road that morning. Police routinely patrolling the area also were not aware of any wide loads being transported along the route the day of the accident.
Mr. Kose sought to establish the extent of his injuries and his physicians testified that he may need additional surgeries including a knee replacement and arthroscopic surgery on his elbow. One expert set his total body impairment at 40 percent. Mr. Kose stated that due to the pain which he still has from his various injuries, he sleeps in a recliner, cannot work as effectively in his boat repair business, and cannot engage in many of the outdoor activities and water sports that he previously enjoyed. According to Mr. Kose's orthopedic surgeon, the plaintiff will probably have to stop working in the boat repair business in five to ten years. The jury returned a verdict in favor of the plaintiffs, awarding the following amounts:

A. General damages, past and future
 pain and suffering, permanent
 injuries and disfigurement $ 885,514.00
B. Past medical bills $ 37,725.00
C. Future medical bills $ 900,000.00
D. Past wage loss $ 36,761.00
E. Future loss of earnings and/or
 earning capacity $ 190,000.00
F. Loss of enjoyment of life $ 10,000.00
G. Loss of consortium (Mrs. Kose) $ 50,000.00
 _____________
TOTAL $1,300,000.00

A judgment incorporating the jury's award was signed by the trial court on December 18, 1998. The defendants then filed a motion for judgment notwithstanding the verdict and for a new trial. Cablevision claimed that the jury erred in failing to assess third party fault to unknown parties it claimed were responsible for the cable breaking loose from the pole. The defendants also objected to the trial court allowing the plaintiffs' expert to conduct additional testing during the trial, that the jury abused its discretion in making a general damage award of $885,514.00 and that the jury abused its discretion in awarding $190,000.00 in lost earnings and/or earning capacity. Following a hearing, the trial court denied the defendants' motions. The defendants appealed, claiming that the jury erred in failing to find that there was third party fault, the judge erred in allowing the plaintiffs' witness and expert to conduct tests during trial and to change their testimony based upon the tests, the jury made an excessively high general damage award, the jury erred in awarding damages for future lost earnings and/or earning capacity based upon speculation, and the trial court erred in allowing six lines for general damages on the jury verdict form. The defendants also object to the trial court denial of the motions for JNOV and new trial.

*1045 THIRD PARTY FAULT
The defendants argue that the jury and trial court erred in finding Cablevision to be 100 percent at fault. They contend that the evidence showed that the P hook or J hook holding the cable was cracked by some external force, rather than by gradual deterioration. According to the defendants, the cable had been up only minutes before when Mr. Kose went through the intersection. They contend that a mobile home must have been transported down the road to a nearby trailer park at some point before this accident, dislodging the cable. Therefore, they claim that a third party must have dislodged the cable and the failure of the jury to assess a percentage of fault to a third party necessitated the granting of a new trial or judgment notwithstanding the verdict.
A court of appeal may not set aside a finding of fact by a trial court or jury in the absence of "manifest error" or unless it is "clearly wrong," and where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989).
A judgment notwithstanding the verdict (JNOV) is the procedural device authorized by La. C.C.P. art. 1811 whereby the trial court may correct a legally erroneous verdict by modifying fault or damages, or both, that the jury may have assessed. JNOV is a question of whether the jury verdict, as a matter of law, is supported by any legitimate or substantial evidence. To determine that the evidence was insufficient as a matter of law requires a finding that no valid line of reasoning and permissible inferences could possibly lead rational persons to the conclusions reached by the jury. Matthews v. Arkla Lubricants, Inc., 32,121 (La.App.2d Cir.8/18/99), 740 So.2d 787. In applying this standard, the trial court may not substitute its judgment of the facts for that of the jury and must consider all evidence in the light most advantageous to the party in whose favor the jury verdict was rendered, giving this party the benefit of every legitimate and reasonable inference that could have been drawn from the evidence. The trial court does not have the discretion to weigh the evidence, evaluate the credibility of witnesses, or substitute its judgment for that of the jury. All reasonable inferences or factual questions should be resolved in favor of the nonmoving party. Matthews v. Arkla Lubricants, Inc., supra.
A motion for new trial may be granted under La. C.C.P. art.1972 when the verdict or judgment appears clearly contrary to the law and evidence. La. C.C.P. art.1973 provides that a new trial may be granted in any case where there is good ground therefore, except as otherwise provided by law. In considering a motion for new trial, the trial judge is free to evaluate the evidence without favoring either party; he may draw his own inferences and conclusions and may evaluate the credibility of the witnesses to determine if the jury has erred in giving too much credence to an unreliable witness. Smith v. American Indemnity Insurance Company, 598 So.2d 486 (La.App. 2d Cir. 1992), writ denied, 600 So.2d 685 (La. 1992).
The plaintiffs sought to recover against the defendants under the theory of strict liability set forth in La. C.C. art. 2317, which was in effect at the time this accident occurred. The strict liability imposed by that article requires the plaintiff to prove that the vice or defect of the thing is a condition which poses an unreasonable risk of harm to others, the thing was in the defendant's custody and that the damage resulted from this vice. McBride v. Cracker Barrel Stores, Inc., 94-370 (La. App. 3d Cir.11/2/94), 649 So.2d 465. A determination of whether a thing presents an unreasonable risk of harm should be made in light of all relevant moral, economic *1046 and social considerations. Bison v. Primrose, 30,011 (La.App.2d Cir.12/10/97), 705 So.2d 249, writ denied, 98-0090 (La.3/13/98), 713 So.2d 471.
The plaintiffs do not dispute that the hook was broken by an external force rather than by gradual deterioration. However, they sought to show that the cable, which had been installed approximately seventeen years before this accident, was hanging too low and hit Mr. O'Connor's car, breaking the hook holding one side of the cable. Dorothy Legg, an administrative assistant with Cablevision, testified that generally cables are hung 18 feet above the roadway, but she did not know what height this cable was when installed or how high it was when the accident occurred. Cablevision employees testified that once the cables were installed, there was no routine inspection procedure to insure that they were in good repair. Employees simply look at the lines when they were in an area doing work.
The plaintiffs' expert, Claude R. Mount, testified that the cable was hanging lower than 18 feet over the road and the most likely cause of the accident was that the cable hit Mr. O'Connor's car, causing the P or J hook to break. Under these facts, we find that the plaintiffs carried their burden of proving strict liability on the part of the defendants for damage caused by the cable.
Once the plaintiff proves the elements of La. C.C. art. 2317, the owner or guardian responsible for the person or thing can escape liability only if he shows the harm was caused by the fault of the victim, by the fault of a third person, or by an act of God. Bison v. Primrose, supra. The fault of a "third person" which exonerates a person from his own obligation importing strict liability is that which is the sole cause of the damage, of the nature of an irresistible and unforeseen occurrence, i.e., where the damage resulting has no causal relationship whatsoever to the fault of the owner in failing to keep his building in repair, and where the "third person" is a stranger rather than a person acting with the consent of the owner in the owner's nondelegable duty to keep his building in repair. Olsen v. Shell Oil Company, 365 So.2d 1285 (La.1978); Dotson v. Matthews, 480 So.2d 860 (La.App. 2d Cir.1985), writ denied, 481 So.2d 1336 (La.1986).
The defendants sought to defend against the plaintiffs' claims by asserting that the cable was torn loose by a third party, exonerating Cablevision from strict liability. The defendants' theory was that a mobile home passed through the area, breaking the P or J hook and causing the cable to dangle into the roadway. The evidence adduced at trial fails to support this theory.
Frances W. Kirkendoll lived on Jefferson Paige Road at the scene of the accident. She testified that on the morning Mr. Kose was injured, she was at home with pneumonia and spent the day looking out her front window. She stated that her cable service went out shortly before the accident and she telephoned Cablevision to report the outage. At that point, she was told that it would be the next day before someone would be sent out. After the accident, when the cable was in the middle of the road, Mrs. Kirkendoll again called Cablevision. Her service was restored later that day. According to Mrs. Kirkendoll, there is a mobile home park on Jefferson Paige Road, but it is a long way from her house. She stated that occasionally mobile homes are transported down the road, but she didn't see one pass on the day of the accident
William Troy Klingensmith lived close to Mrs. Kirkendoll on Jefferson Paige Road. On the morning of this accident he was at home watching television when he heard his dogs barking. He looked out to see Christopher Cobb fending off the animals with his bicycle. As Mr. Klingensmith was preparing to go out to call off the dogs, he heard a sound, looked out, and saw Mr. Kose flipping and sliding down the road on his motorcycle. Mr. Klingensmith testified *1047 that occasionally mobile homes are moved down Jefferson Paige Road, but he did not see one pass that day. He was asked if he had ever seen mobile homes knock down wires while being transported. He stated that he had, but he had never seen that happen on Jefferson Paige Road.
James K. Baker, the law enforcement officer who worked this accident, stated that he patrolled the area where the accident occurred and did not see any oversized vehicles in the area that day.
Based upon our review of the record, we find that the defendants simply failed to prove that this accident was attributable to third party fault. The defendants offered no evidence in support of their defense. The jury was reasonable in rejecting that defense and the trial court did not err in rejecting the defendants' motions for JNOV and new trial, urging third party fault.

DISCOVERY DURING TRIAL
The defendants argue that the trial court erred in allowing the plaintiffs to conduct additional tests during trial and allowing experts to change their testimony based upon those tests. Prior to trial, the plaintiffs measured to determine the height of the cable above the roadway. In a pretrial deposition, James M. Jones, Jr., who made the measurements for the plaintiffs, opined that the cable had been installed higher after the accident. To prevent Mr. Jones from testifying at trial to a subsequent remedial measure, Cablevision filed a motion in limine, which the trial court granted on the day the trial commenced. During the course of the trial, there was some discussion between counsel and the court about determining the height of the cable at the time of the accident. The court offered to let the plaintiffs return to the scene and take additional measurements and then allow the plaintiffs' expert to use those measurements in calculating the cable height at the time of the accident. At that point, Cablevision did not object. The plaintiffs' expert, Claude Mount, also testified concerning the amount of sag in the cable. He developed his expert opinion based upon experiments conducted in his own back yard two weeks prior to trial. This information was not included in Mr. Mount's deposition. The defendants complain that the court's action allowed new opinions based upon recent tests, contrary to the rules of discovery. According to the defendants, they were ambushed at trial by these developments. They claim that they were not able to properly rebut such evidence developed during the course of the trial. These arguments are without merit.
The defendants rely upon Williams v. General Motors Corporation, 93-0287 (La. App. 4th Cir. 2/11/94), 639 So.2d 275, writs denied, 94-1896, 94-1898 (La.11/11/94), 644 So.2d 387, 388, for their argument that the additional testing and new expert opinions based thereon were improperly admitted at trial. That case dealt with a products liability suit alleging a particular manufacturing defect in a car. The defendant spent five years developing its case, in preparation to defend against the argument that the car had a particular defect. At trial, the plaintiffs expert came up with the theory that a different defect could have caused the plaintiffs damage. On rehearing, the appellate court found that the trial court erred in allowing such evidence. In Williams, the appellate court stated this was the type of unfair trial proceeding prohibited by La. C.C.P. art. 1425, which declares that the subject matter on which the expert is expected to testify and the substance of the facts to which the expert is expected to testify must be disclosed through interrogatories and depositions. According to Williams, the case law has interpreted this provision to protect a party from prejudicial surprise at trial by the introduction of evidence not previously known by him to exist, and against which he could not therefore have prepared a rebuttal. The discovery articles are designed to promote fair trials and *1048 to discourage ambush. Williams v. General Motors Corporation, supra.
In Williams, the defendant made an objection to the introduction of the new information set forth by the expert. In that case, the expert changed his theory mid-trial and focused on another system of the car as the cause of the accident. Here, the plaintiffs' focus was always on the height of the cable. In the present case, the defendants did not make an objection to the new testing or the introduction of the expert's testimony incorporating the results of the new testimony. An objection to a witness or to the introduction of evidence is waived if the objection is not raised at a time when the error can be corrected. Briscoe v. Briscoe, 25,955 (La.App.2d Cir.8/17/94), 641 So.2d 999. To preserve an evidentiary issue for appellate review, it is essential that the complaining party enter a contemporaneous objection to the evidence or testimony and state the reasons for the objection. Stephens v. Town of Jonesboro, 25,715 (La.App.2d Cir.8/19/94), 642 So.2d 274, writs denied, 94-2351, 94-2557 (La.11/29/94), 646 So.2d 400.
We also note that, as to Mr. Mount's testing in his back yard for sag in the cable, these experiments were in part made necessary by the defendants. The defendants' expert and the plaintiffs' expert were to meet in Houston, Texas, to examine and perform tests upon the hook and the cable involved in this accident. The defendants' expert canceled the session shortly before trial with no explanation. Therefore, the plaintiffs' expert took measures deemed necessary to prepare for trial. Moreover, much of Mr. Mount's testimony regarding the testing was elicited on cross-examination by the defendants.

GENERAL DAMAGE AWARD
The defendants object that the jury abused its discretion in making a general damage award of $885,514.00.[1] They contend that Mr. Kose suffered only a broken elbow, a fractured clavicle and injuries to his neck, back and knee. He had surgery twice on his elbow and had surgery on his knee. One medical expert testified that Mr. Kose might need a knee replacement in the future. According to the defendants, Mr. Kose's treating physician was not aware that the plaintiff had a water-skiing accident in 1985, injuring his neck and back, and had taken narcotic pain relievers for ten years prior to his present injury. The defendants also claim that there is no competent evidence that the plaintiff will incur any significant medical expenses in the future. According to the defendants, compared with similar injuries, the highest amount for a general damage award that could be affirmed is $125,000.00.
General damages involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of life or lifestyle that cannot be measured definitively in terms of money. Maranto v. Goodyear Tire & Rubber Company, 25,114 (La.App.2d Cir.5/10/95), 661 So.2d 503. The primary objective of general damages is to restore the party in as near a fashion as possible to the state he was in at the time immediately preceding injury. Eppinette v. City of Monroe, 29,366 (La.App.2d Cir.6/20/97), 698 So.2d 658. There is no mechanical rule for determining general damages; the facts and circumstances of each case control. Factors to be considered in assessing quantum for pain and suffering are severity and duration. Maranto v. Goodyear, supra.
The trial court has much discretion in the assessment of damages in *1049 tort cases. La.C.C. art. 2324.1. The discretion vested in the trier of fact is great, even vast, so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corporation, 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); Barnes v. Reed, 32,380 (La.App.2d Cir.10/29/99), 743 So.2d 936. The proper procedure for examining whether an award is excessive is to determine whether the amount can be supported under the interpretation of the evidence most favorable to the plaintiff, which reasonably could have been made by the trier of fact; likewise, to determine if an award is inadequate, the evidence must be viewed in the light most favorable to the defendant. DeYoung v. Simons, 32,378 (La.App.2d Cir.10/27/99), 743 So.2d 851.
An award made in the trial court may not be modified unless it is unsupported by the record. The appellate question is not whether a different award may have been more appropriate, but whether the trial court's award can be reasonably supported by the record. Burnham v. Frey-Shoemaker-Colbert-Brodnax, 445 So.2d 477 (La.App. 2d Cir. 1984). Only after finding that the damages are an abuse of discretion may the appellate court turn to prior awards to gauge the highest or lowest possible quantum for the plaintiff. Hughes v. Bossier Parish School Board, 32,225 (La.App.2d Cir.10/29/99), 745 So.2d 816.
Dr. Michael T. Acurio, the orthopedic surgeon who treated Mr. Kose, testified as to his injuries. He suffered a broken elbow, a knee injury, a fractured collarbone and possible neck and back injuries super-imposed on preexisting conditions of his neck and back.[2] Dr. Acurio performed surgery to repair Mr. Kose's elbow and performed an additional procedure later to remove the pins in the joint. Dr. Acurio did arthroscopic surgery on the plaintiff's knee. Mr. Kose still has knee pain. His collarbone took an abnormally long time to heal. He may also require surgery on his collarbone. According to Dr. Acurio, in the future, Mr. Kose may need fusion surgery in his neck, a knee replacement, and an arthroscopic procedure on his elbow. The doctor also stated that the more the plaintiff works, the worse it is for his elbow and knee. Dr. Acurio thought that Mr. Kose will not be able to work at his present occupation in five to ten years. Dr. Acurio assigned a 40 percent disability to Mr. Kose as a whole. However, without the neck and back injuries, which were to some extent preexisting, he assigned Mr. Kose a 25 percent disability.
Dr. Stuart I. Phillips, an orthopedic surgeon who examined Mr. Kose, noted the injuries to his elbow, knee and collarbone, and stated that he also injured his hip and had narrowed disc space at the C4-5 and C5-6 level of his neck, with a bone spur. In addition, he had lumbosacral arthritis aggravated by the accident and calcification of the ligaments in his knees, as well as the injuries to his elbow, knee, hip and collarbone. Upon Dr. Phillips' second examination of Mr. Kose, it was noted that he was learning to use his left hand for many tasks.
Dr. Donald C. Faust, an orthopedic surgeon, examined Mr. Kose on September 6, 1996. He noted some limitation of movement in Mr. Kose's elbow along with degenerative changes and found bulging discs at the C4-5 and C5-6 level of his neck. Dr. Faust did not find any loss of range of motion in Mr. Kose's cervical spine. He noted degenerative changes to his elbow and, to a lesser extent, to his hip and knee. However, Dr. Faust noted that the muscles in Mr. Kose's right arm were not atrophied, indicating that he still used the arm a good deal. Dr. Faust opined that Mr. Kose's only impairment *1050 was 10-15 percent to his upper right extremity.
Based upon the record, we find that Mr. Kose sustained injuries to his collarbone, elbow, and knee, and to some extent had an aggravation of a preexisting condition of his neck and back. His elbow and knee injuries will continue to degenerate over time. However, Mr. Kose was able to resume his work activities and spent only one night in the hospital following the accident. Also, immediately following the accident, he accompanied his motorcycle to the repair shop before he went to the emergency room for treatment of his injuries. Under these circumstances, we find that the jury award for general damages was excessive. Therefore we have undertaken a review of similar injuries to determine the highest amount that could properly be awarded to Mr. Kose for general damages. Based upon that review, we find that the highest award that may be made in this case is $275,000.00.[3]

FUTURE WAGES AND EARNING CAPACITY
The defendants claim that the jury erred in awarding $190,000.00 in future lost wages and/or earning capacity. The defendants assert that Mr. Kose had a sporadic earning history and actually earned more after this accident than he did before. Cablevision contends that the jury award is based on the erroneous idea that Mr. Kose will not be able to do any work at all in five-ten years.
The factors to be considered in determining loss of future income include the plaintiff's physical condition before and after the injury; the age and life expectancy, prior to and after the accident; previous earnings; work record; the amount the plaintiff probably would have earned absent the injury; and the probability he would have continued to earn wages over the balance of his working life. Viator v. Gilbert, 253 La. 81, 216 So.2d 821 (1968); Maranto v. Goodyear Tire & Rubber Company, supra.
In computing loss of future income, it is necessary to determine whether and for how long a plaintiff's disability will prevent him from engaging in work of the same or similar kind that he was doing at the time of the injury. A determination must also be made of whether the plaintiff has been disabled from work for which he is fitted by training and experience. Maranto v. Goodyear Tire & Rubber Company, supra.
*1051 Lost earning capacity is not necessarily determined by actual loss; damages may be assessed for what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. Such damages are calculated on the person's ability to earn money rather than on what he actually earned before the injury. Eppinette v. City of Monroe, supra.
The record shows that after the accident in 1995, Mr. Kose's income actually did increase dramatically. However, he explains that for several years prior to the accident, he had reduced his work load in order to care for his elderly grandfather. At about the time the accident occurred, he had begun working more. Due to his injuries, he did not work much in 1995 and 1996. In 1997, he earned $16,066.00 and in 1998 he earned $27,954.00. Mr. Kose also attributed his increased income in part to an upturn in the economy.
To support their claim for lost future earnings and lost earning capacity, the plaintiffs called as a witness G. Randolph Rice, Ph.D., in economics. According to Dr. Rice, Mr. Kose had a 17.76 year work life expectancy. However, according to his treating physician, Mr. Kose will probably have to stop working in five to ten years due to his injuries. Based upon Mr. Kose's current income figures, Dr. Rice determined that if the plaintiff stopped working in five years, his loss would be $284,852.00 and if he works only ten more years, his loss will be $164,881.00. If Mr. Kose works for five years and then goes to another job earning $7.00 per hour, he would lose $136,485.00. If he worked for ten more years and then took a lower paying job for the remainder of his work life expectancy, his loss would be $77,002.00. If he worked for five years and then took a job for $10.00 an hour, his loss would be $72,899.00. If he worked for ten years and then took a job at $10.00 per hour, his loss would be $42,196.00.
At trial, it was shown that the plaintiff has severe injuries to his elbow and knee which interfere with the performance of his work repairing boats. The injuries to the elbow and knee will continue to degenerate with the passage of time. Dr. Acurio, Mr. Kose's treating physician, determined that the plaintiff will probably have to cease working at his present occupation in five to ten years. Mr. Kose now requires the services of an assistant to do many of the tasks he formerly accomplished unaided. Given these factors and the unrebutted figures provided by Dr. Rice, the economist, the jury award of $190,000.00 for lost wages does not appear to be an abuse of discretion. Therefore, we reject the defendants' claim that this award was excessive.

JURY VERDICT FORM
The defendants contend that the jury verdict form was defective. They argue that La. C.C.P. art. 1812(C)(4)[4] provides that a jury verdict form may have a maximum of three lines, one for general damages, one for special damages and one for exemplary or punitive damages, if allowed. Because exemplary or punitive damages were not allowed in this case, the defendants assert that the jury verdict form should properly have had only have two lines for damages. The jury verdict form used at trial had six lines: (1) general damages, past and future pain and suffering, permanent injuries and disfigurement; (2) past medical bills; (3) future medical bills; (4) past wage loss; (5) future loss of earnings and/or earnings capacity; (6) loss of enjoyment of life. According to the defendants, six lines on the form were a *1052 clear violation of La. C.C.P. art. 1812 and, despite the lack of a contemporaneous objection, they have not lost their right of review. They claim their right of review is still viable because this is a plain and fundamental error in jury submissions in which the court objection requirement of La. C.C.P. art. 1793[5] may be relaxed. This argument is without merit.
The jurisprudence holds that unless a party objects to jury instructions before the jury retires or immediately thereafter, that party may not assign as error the giving of that instruction. Further, a party waives its objection to the jury interrogatory form if the objection is made after the jury retires. Horton v. McCrary, 620 So.2d 918 (La.App. 3d Cir. 1993), affirmed in part and reversed in part on other grounds, 93-2315 (La.4/11/94), 635 So.2d 199. Failure to make a contemporaneous objection to either jury interrogatories or a verdict form precludes a party from raising the issue for the first time on appeal. Whited v. Home Depot U.S.A., Inc., 27,938 (La. App.2d Cir.8/3/96), 712 So.2d 97, writ denied, 96-2340 (La.11/22/96), 683 So.2d 282; Luman v. Highlands Insurance Company, 25,445 (La.App.2d Cir.2/23/94), 632 So.2d 910. The objection must be specific and allow the trial judge an opportunity to correct the error. Jordan v. Intercontinental Bulktank Corporation, 621 So.2d 1141 (La.App. 1st Cir.1993), writs denied, 623 So.2d 1335, 1336 (La.1993), cert. denied, 510 U.S. 1094, 114 S.Ct. 926, 127 L.Ed.2d 219 (1994).
Although the defendants argue that the inclusion of several lines on the jury verdict form for damages is a "plain and fundamental error" which relaxes the application of the contemporaneous objection requirement of La. C.C.P. art. 1793, neither the facts of this case nor the cases cited by the defendants support that argument. Trans-Global Alloy Limited v. First National Bank of Jefferson Parish, 583 So.2d 443 (La.1991). In Gilbert v. LaBorde, 93-761 (La.App. 3d Cir.2/2/94), 632 So.2d 1162, writ denied, 94-0896 (La.5/20/94), 637 So.2d 480, the trial court failed to charge the jury on the law applicable to the case. The appellate court found that this failure may have been such an egregious error that it needed no objection or assignment of error to be considered on appeal, noting that the requirement of an objection to jury charges may be relaxed when there is a plain, fundamental error.
In the present case, there has been no showing that the jury was not instructed as to the law applicable to the case or that any party was faced with the potential wrongful denial of the right to a jury trial. The defendants were given ample opportunity to examine the jury verdict form prior to its submission to the jury and failed to make any objection at that time. Therefore, the defendants have failed to show a plain and fundamental error requiring the relaxation of the contemporaneous objection requirement of La. C.C.P. art. 1793. Without such an objection, the issue has *1053 not been properly preserved for consideration on appeal.

CONCLUSION
For the reasons stated above, we affirm the jury verdict and trial court judgment finding that Cablevison of Shreveport was 100 percent at fault in causing this accident. We also affirm the trial court judgment rejecting the defendants' claims that the plaintiffs were improperly allowed to undertake additional testing during trial and that the jury verdict form had more lines than the number allowed by law for damages. We amend that portion of the jury verdict and trial court judgment dealing with general damages. We vacate the former award and order that the defendants pay unto the plaintiffs $275,000.00 in general damages. We affirm the jury verdict and trial court judgment awarding the plaintiffs $190,000.00 in lost future wages. The jury verdict is affirmed in all other respects. Accordingly, the total amount of damages to be paid to the plaintiffs by the defendants is $689,486.00, with legal interest from the date of judicial demand until paid. Costs in this court and in the court below are assessed to the defendants.
AFFIRMED IN PART; AMENDED IN PART AND AS AMENDED, AFFIRMED.
NOTES
[1] In their brief, the defendants also argue that the trial court award for future medical expenses was based upon speculation. However, the defendants did not object to this item of damages at trial and did not assign it as error on appeal. Therefore, this item of damages is not properly before this court for review.
[2] In 1985, Mr. Kose sustained injuries to his neck and back when he fell off an inner tube being pulled behind a boat. He received chiropractic care for these injuries in addition to a prescription for a narcotic pain reliever from his family physician.
[3] See Liner v. Terrebonne Parish Consolidated Government, 612 So.2d 168 (La.App. 1st Cir. 1992), plaintiff was awarded $75,000 in general damages for a broken arm, elbow, and hip; Gage v. Potts, 94 1542 (La.App. 1st Cir. 4/7/95), 653 So.2d 1183, $20,000 in general damages for a knee injury requiring surgery and for back strain; Dawson v. City of Bogalusa, 95 0824 (La.App. 1st Cir. 12/15/95), 669 So.2d 451, $110,000 for 40 percent disability to the plaintiff's right leg; Hurts v. Woodis, 95 2166 (La.App. 1st Cir. 6/28/96), 676 So.2d 1166, $36,500 for back injury and aggravation of a knee injury; Peter v. Allstate Insurance Company, 563 So.2d 1309 (La.App. 3d Cir.1990), $15,000 for a broken collarbone and fractured toe; Terro v. Casualty Reciprocal Exchange, 93-593 (La.App. 3d Cir.2/2/94), 631 So.2d 651, writ denied, 94-0522 (La.4/22/94), 637 So.2d 157, $100,000 to a 33-year-old woman with a broken arm and right ankle, and a punctured lung, who underwent surgery, spent two weeks in the hospital, required physical therapy and used a walker for five months; Davis v. State, Department of Transportation and Development, 94-308 (La.App. 3d Cir.12/7/94), 647 So.2d 552, writ denied, 95-0034 (La.1/27/95), 649 So.2d 382, $580,000 to a woman with severe and numerous injuries and with permanent disability who was comatose for three weeks and $150,000 to 12-year-old girl with severe leg, knee and hand injuries, who was unable to attend school for the year following the accident; Roger v. Cancienne, 538 So.2d 670 (La. App. 4th Cir.1989), writ denied, 542 So.2d 1382 (La.1989), $125,000 for an elbow injury to a 12-year-old child; Stark v. National Tea Company, 94-2633 (La.App. 4th Cir. 5/16/95), 655 So.2d 769, writ denied, 95-1801 (La.11/3/95), 661 So.2d 1380, $33,000 for neck, back, wrist and shoulder injuries with elbow surgery and a 25 percent loss of strength in hand.
[4] La. C.C.P. art. 1812(C)(4) provides:

(C) In cases to recover damages for injury, death, or loss, the court at the request of any party shall submit to the jury special written questions inquiring as to:
(4) The total amount of special damages and the total amount of general damages sustained as a result of the injury, death, or loss, expressed in dollars, and, if appropriate, the total amount of exemplary damages to be awarded.
[5] La. C.C.P. art. 1793 provides:

A. At the close of the evidence, or at such earlier time as the court reasonably directs, a party may file written requests that the court instruct the jury on the law as set forth in the requests.
B. The court shall inform the parties of its proposed action on the written requests and shall also inform the parties of the instructions it intends to give to the jury at the close of the evidence within a reasonable time prior to their arguments to the jury.
C. A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection. If he objects prior to the time the jury retires, he shall be given an opportunity to make the objection out of the hearing of the jury.
D. The jury may take with it or have sent to it a written copy of all instructions and charges and any object or document received in evidence when a physical examination thereof is required to enable the jury to arrive at a verdict.