841 So.2d 831 (2003)
Roslyn IRSCH
v.
ARGONAUT GREAT CENTRAL INSURANCE COMPANY and Harbor Seafood and Oyster Bar, Inc.
No. 02-CA-988.
Court of Appeal of Louisiana, Fifth Circuit.
January 28, 2003.
*833 Eric J. Halverson, Jr., Metairie, LA, for Appellants.
Leonard J. Cline, Thomas G. Robbins, Metairie, LA, for Appellee.
Panel composed of Judges EDWARD A. DUFRESNE, JR., MARION F. EDWARDS and WALTER J. ROTHSCHILD.
MARION F. EDWARDS, Judge.
Defendants/appellants Harbor Seafood and Oyster Bar (Harbor), and its insurer Argonaut Great Central Insurance Company (Argonaut), appeal a judgment of the district court in favor of plaintiff/appellee Roslyn Irsch. For the reasons to follow, we amend and affirm.
Mrs. Irsch filed suit for injuries suffered when she fell near the front entrance of Harbor. She alleged in her petition that as she walked to the restaurant a number of chairs placed in a parking space obstructed her view of a bumper guard and presented a tripping hazard, which precipitated her fall. In its answer, Harbor requested a jury trial. On the morning of trial, Mrs. Irsch moved to strike the jury, stipulating that her injuries were worth less than $50,000.00. Harbor objected, arguing *834 that a settlement demand of $125,000 had recently been made. The court granted the motion, and Harbor took writs to this court, which writs were denied.
The trial proceeded, and at its conclusion, the court granted judgment in favor of Mrs. Irsch and against Harbor and Argonaut in the amount of $36,500.00 for general damages, and $11,967.02 for past medicals, for a total of $48,467.02. It is from this judgment that Harbor and Argonaut appeal.
In its Reasons for Judgment, the court determined that the evidence and testimony established that Harbor commonly used the portion of the parking lot where Mrs. Irsch fell as a seating area for its patrons. Eight to ten plastic chairs, placed in the far right parking aisle just in front of the entrance, were in front of the yellow concrete bumper guard, and some were behind it. Although Harbor claimed Mrs. Irsch was legally blind and had other physical limitations that restricted her ability to walk without assistance, the court reviewed the evidence presented at trial and concluded that she could adequately see large objects which were in close proximity. The court then reviewed the testimony of expert witnesses presented by both parties and concluded that the placement of the chairs presented an unreasonable risk of harm, and that no person walking through an area in which chairs for seating have been placed should reasonably expect to encounter a large immovable obstruction at just above ground level. An even greater hazard existed when chairs were placed in front of that obstruction. The court found that customers had most likely inadvertently moved the chairs from their proper Ushaped arrangement. Photographs suggested that the area was clearly intended to be a means of ingress and egress, and failure to remove the bumper guard created an unreasonable risk of harm. It was determined that the accident was foreseeable.
At trial, Mrs. Irsch testified that in 1998, she fell, tearing her left kneecap and breaking a bone in her right leg. Dr. Parnell placed metal clamps holding her knee together and a plate in her right leg. After this, her progress was "awesome", and she had no problems walking after that. On the date of this accident, she did not need any assistance. She had also had a problem with her eyes, in that sometimes she saw well and other times did not, and sometimes saw better out of one eye than the other. Her doctor had given her a laser treatment in the September preceding the accident in question, which worked. She could shop, walk her grandson to school, watch television and read large print. When the present accident occurred, she had gotten out of the car and began walking through the seating area to the restaurant with Dylon. Dylon went through one white chair and she went through the other, and when they were four or five feet into the middle of the walkway, the hostess told them to put in their name. She told Dylon to go ahead and give the hostess their name, and then instead of waiting for her daughter, she decided to also go on in. The next thing she remembered was going past the chairs and hitting her right foot very hard on an obstruction. The chairs were up against the bumper, which her foot hit, causing her to fall. There were four chairs on the front, or Williams Boulevard side, of the guard. She did not see the bumper guard before she fell, not did she expect it to be there, because she had just walked through some chairs with no obstructions. When she had gone there previously, there was a bench where people waited, but no chairs. She had always entered the place before from the back. In the accident she *835 injured her hip. The hostess saw her fall, and came to help her. Eventually she was taken away by ambulance. She often walked holding hands with her daughter, as "a loving thing." None of her doctors told her she should not walk unless she had assistance.
Mrs. Irsch's daughter, Karen Schillace, testified that for thirty days prior to the accident, her mother's eyesight was "doing very well." She could see characters on cards, large writing, television and movies. On the day of the accident, Ms. Schillace and Mrs. Irsch, who lived together, had gone shopping, at which time Mrs. Irsch walked around without assistance. Once or twice a week Mrs. Irsch walked her grandson Dylon six blocks to school, then walked home unassisted. After a fall in 1996, Mrs. Irsch fractured her tibia, but eventually was able to walk, although she could not bend her knees totally. After another fall in 1998, metal screws placed in her knee appeared to make her leg stronger, and she could walk and bend her knees normally, including walking up and down stairs.
On the day of the accident, Mrs. Irsch, Ms. Schillace, and Dylon went to Harbor for lunch. Ms. Schillace left her mother and Dylon in front of Harbor while she parked the car in the back lot, since the parking spaces in front were full. When she walked around, she saw her mother on the ground, but did not see her fall. There were four to six chairs out in front of the bumper guard, extending from one end to the other. There were also other chairs out in the area. Mrs. Irsch related that she had tripped over the bumper and fallen. She had broken her hip and was transported to Charity Hospital by ambulance.
On cross-examination, Ms. Schillace stated that when she saw her mother on the ground, the restaurant hostess was tending to her. She had been to the restaurant several times in the past, but had never before seen the chairs configured in the front. There was no car parked in front of the bumper guard where her mother fell. One could have approached the front entrance from the right hand side of the bumper guard, but Mrs. Irsch would have had to go backwards to go around, walking in essentially a half circle. Further, she stated that prior to the accident in question, she had escorted her mother to her doctor's appointments, holding her hand and steering her.
Dylon, who was ten years old on the date of the accident, and twelve years old at the time of trial, testified that Ms. Schillace let him and his grandmother out in front of the restaurant, and they went on through the chairs until at about the middle of the way, the hostess leaned out and told them to put their name in. Dylon had his back to his grandmother, and the hostess went in to get a pen. When she returned, she ran out with a scared look and Dylon turned around to see that Mrs. Irsch had fallen over the parking bumper. He did not actually see her fall, and she did not tell him what had happened. There were about twelve chairs in front of the restaurant, located in the first parking spot. He himself tripped over the bumper, but caught himself. After the accident, the chairs were moved around. Mrs. Irsch had not had trouble walking prior to this, and had walked him to school and gone shopping without difficulty. There was no space where someone could walk between the side of a parked car and the chairs. There were more chairs, which were more jumbled up, on the day of the accident then there were in the photographs admitted at trial.
Victor Bedikian was qualified as an expert architect with emphasis on building standards and codes. He inspected the *836 Harbor premises, and viewed various photographs. Assuming the scene to be as described by Ms. Schillace, the witness concluded that several code violations occurred and several standards were violated. The Life Safety Code governs Louisiana in this regard, and states there should be no obstructions in the path of travel, for egress or ingress. According to the evidence and to his inspection, the area of the concrete bumper, when used as an overflow seating area, changes the use of the area, and the five-inch high bumper guard became an obstruction, serving no useful purpose. The chairs were also obstructions, and the fire marshal has the right to have chairs removed in order to make the most direct path of travel free from obstruction. The most direct route into Harbor was through the chairs. People walk the most direct route, and the code holds the path of egress is the most direct route. Harbor eliminated the most direct passage to the street right of way, and the chairs should have been placed with a gap down the middle to allow clear passage. If this area were going to be used on a permanent basis as a seating area, the bumper guard should have been removed. The bumper guard located in an area used as a seating area was a violation of the Life Safety Code. The National Safety Code states that bumper stops are to be placed only in parking lanes of parking facilities. This is so because the guards present a tripping hazard. The location of the guard also violates the Americans with Disabilities Act, which mandates that buildings shall be made safe for the handicapped, including senior citizens whose senses may have been diminished by age. The expected norm is that the path of travel would not have an obstruction such as a bumper guard, and the most plausible reason Mrs. Irsch did not see it is because she did not expect it to be there.
On cross-examination, Mr. Bedikian stated that if Mrs. Irsch had been let off in a position such that she had a straight approach to the restaurant, and the chairs were to the right of the bumper, he would assume that she would have made for the gap. Even if the chairs were to the side, a bumper guard in a space that is used for seating is a hazard.
Chester George, manger of the Fisherman's Cove, which is part of Harbor and next door, testified that on the day of the accident he was working at Harbor as an oyster shucker, and heard that someone fell. When he went to assist Mrs. Irsch, she told him that she had fallen and was not supposed to walk without assistance or without her knee stabilizer. When Ms. Schillace arrived, she also commented that her mother was not supposed to walk by herself. He did not remember seeing chairs in the vicinity of the parking space, but did not think there were any. Chairs were put out at busy times, and occasionally, customers moved them around. The hostess was supposed to reconfigure the arrangement, and the proper form was a U-shape set inside the yellow lines of one parking space. The chairs do not go up against the bumper. No one has ever fallen in this lot before.
Mona Carter testified that on the day of the accident, she was sitting in her car in the parking lot, in the space next to where the chairs were placed, waiting for her sister to pick up their order from Harbor. A car pulled up and a lady and child got out. The lady was unstable, and walked past her side of the car, passing the bumper. Ms. Carter was certain that Ms. Irsch walked between the bumpers and did not stumble or stagger, but rather collapsed. She did not remember if there were chairs in front of the bumper guard, but knew that Mrs. Irsch was past the chairs when she fell on the ramp.
*837 Shelly Melgar was employed at Harbor as a manager at the time of the accident. Usually, on weekends the first parking space is blocked off by chairs set in a horseshoe shape, with the open end of the configuration toward the restaurant entrance. She did not remember any chairs in the vicinity where Mrs. Irsch fell. Customers change the arrangement of chairs when they sit in them. Mrs. Irsch told her after the accident that she had tripped over the bumper guard and said "I know better than to walk unattended. I only have seventy percent vision." She told the witness that she could only see her outline, not her face. When Mrs. Schillace arrived, Ms. Melgar asked her to sign a statement or accident report indicating that she had tripped over the guard. Ms. Carter also volunteered to give a written statement.
Mr. Joseph Lafranca, a forensic engineer, was qualified as an expert in the field of construction. He testified that placing chairs in the parking space did not violate the Life Safety Code, because it is related to fires and deals with exiting, not entering, a building. The Southern Building Code is required for construction in Kenner. Looking at the photographs admitted into evidence, Mr. Lafranca did not find any violations. There was egress from the building parallel to the building with the walkway, as well as egress perpendicular to Williams Boulevard between the last parking place and the edge of the building. The codes that Mr. Bedikian discussed referred to buildings, not parking lots. If the chairs were in the direct path of someone walking, it made sense that they would first hit the chair before hitting the bumper. It was Mr. Lafranca's opinion that if Harbor put chairs out and allowed people to sit in a parking spot, this would not be changing the use from a parking space to a seating area. If there were chairs by the bumper guard, the guard was no more of an obstruction than if one were traversing the area as just a parking lot.
The deposition of Dr. Catherine Fitzmorris was entered into evidence. Dr. Fitzmorris is also an ophthalmologist who treated Mrs. Irsch beginning in January 1999. According to Dr. Fitzmorris, Mrs. Irsch's vision without glasses was 20/400, and with glasses it was 20/200. This translated to an 80% loss of vision, and this would require walking with some assistance. However, she has had patients with this same vision who drive and have never had a wreck, and some people can walk without problems. The doctor diagnosed diabetic retinopathy and referred her to a retinal specialist, Dr. Saer. Dr. Fitzmorris felt that Mrs. Irsch was not capable of judging how much she could see.
Dr. John Saer, an ophthalmologist, testified that he first treated Mrs. Irsch in January 1999 for severe diabetic macular edema and proliferative diabetic retinopathy in both eyes. When he first began to treat her, she had twenty two hundred vision in her right eye, and counting fingers at twelve feet in her right eye. Dr. Saer agreed that such a patient could get around or walk reasonably well. He deferred to Dr. Fitzmorris's, Mrs. Irsch's treating ophthalmologist, opinion on her visual loss, and did not measure her visual field. Rather, measurements were made in his office by his technician. Vision measurements changed during the course of treatment, and Dr. Saer did not know her range of vision at the time of the accident, in November 1999. Throughout the course of treatment, Dr. Saer treated her with lasers to stabilize the retinas. He continued to treat her and on September 16, 1999, she complained that her vision had worsened. It was possible that laser surgery that was done at that time could have improved her eyesight. He did not *838 dispute Mrs. Irsch's statement that she could get around reasonably well.
Dr. Gerardo Aristimuno, an internist, testified via deposition that he first treated Mrs. Irsch in January, 1999. Mrs. Irsch had a longstanding history of diabetes and because her vision had deteriorated, Dr. Aristimuno referred her to Dr. Fitzmorris. In November 1999 she returned to him complaining of blurred vision. She was walking but had difficulty in her vision, and her daughter was helping her. The doctor felt that Mrs. Irsch was legally blind and did not think she could have seen the bumper guard.
Also testifying by deposition was Dr. Melvin Parnell, an orthopedic surgeon. He first treated Mrs. Irsch after her 1998 fall. At that time, he operated on her, using a plate and screws to repair a fracture in her right leg, and on her kneecap he used pins and wire. She also had osteoporosis. Her last visit to him was in March 1999, at which time she was not walking much. Dr. Parnell advised her to walk as tolerated, and if she decided to, she could eventually have walked through a shopping center. However, he did not have any knowledge of her condition or ability to walk eight months after last seeing her.
On appeal, Harbor alleges that the trial court erred in denying it a jury trial, which it had requested. On the morning of trial, Mrs. Irsch's counsel stipulated that her injuries were not valued in excess of the $50,000.00 jurisdictional limit, and requested that the court strike the jury trial requested by Harbor. The court granted the motion over Harbor's objection. Harbor applied to this court for supervisory writs, and the application was denied. This argument was fully briefed in the writ application.
It is well settled that procedural maneuvers designed solely to deprive litigants of their right to a jury trial based on jurisdictional amounts are disfavored.[1] Our Supreme Court has held that under La. C.C.P. art. 1732, the focus is not on the amount of the plaintiff's overall claim arising out of the transaction or occurrence, but on the value of the plaintiff's cause of action against the defendant or defendants who are before the court at the time the right to a jury trial is litigated.[2] A stipulation has the effect of a judicial admission or confession, which binds all parties and the court. Stipulations between the parties are binding on the trial court when not in derogation of law.[3] By her stipulation, the value of Mrs. Irsch's claim did not exceed the applicable jurisdictional limit at the time the trial was litigated. The stipulation was made just prior to trial, after extensive discovery was had and Mrs. Irsch could have reasonably evaluated her claim. Under these circumstances, we cannot say the trial judge erred in striking the jury.
Harbor also asserts that it was error for the court to find that the placement of chairs in the parking space constituted an unreasonable risk of harm. In brief, Harbor appears to argue that the trial court erred in relying on the testimony of Mr. Bedikian rather than that of Mr. Lafranca. While the court specifically disagreed with Mr. Lafranca's opinion that the placement of the chairs did not constitute an unreasonable risk of harm, it did not express a preference for Mr. Bedikian's *839 opinion. Nevertheless, it was well within the discretion of the trial court to grant to Mr. Lafranca's opinion whatever weight it chose to accord. The trier of fact is not bound by expert testimony; rather, expert testimony must be weighed just as any other evidence. The weight to be accorded to the testimony of experts depends largely on their qualifications and the facts on which they base their opinions. The trial court may evaluate expert testimony by the same principles as apply to other witnesses; it has great discretion to accept or reject medical or lay opinion.[4] Based on the record, we find no abuse of that discretion.
Harbors urges that the safety codes discussed by Mr. Bedikian relate to fire safety and egress in an emergency situation, rather than ingress, and thus were inapplicable to the present case. However, there is no indication that the court relied on those codes to determine that the placement of chairs constituted an unreasonable risk of harm.
The owner or person having custody of immovable property has a duty to keep such property in a reasonably safe condition. This duty is the same under both the strict liability theory of La. C.C. art. 2317 and the negligence liability theory of La. C.C. art. 2315.[5] Under both theories, the absence of an unreasonably dangerous condition of the thing implies an absence of a duty on the part of the defendant.[6]
Because a determination that a defect presents an unreasonable risk of harm predominantly encompasses an abundance of factual findings, which differ greatly from case to case, followed by an application of those facts to a less-thanscientific standard, a reviewing court is in no better position to make the determination than the jury or trial court. Consequently, the findings of the jury or trial court should be afforded deference and we therefore hold that the ultimate determination of unreasonable risk of harm is subject to review under the manifest error standard. A reviewing court may only disturb the lower court's holding upon a finding that the trier of fact was clearly wrong or manifestly erroneous. In determining whether a defect presents an unreasonable risk of harm, the trier of fact must balance the gravity and risk of harm against the individual and societal rights and obligations, the social utility, and the cost and feasibility of repair. Simply put: The trier of fact must decide whether the social value and utility of the hazard outweigh, and thus justify, its potential harm to others. W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS §§ 31 (5th ed.1984). The reviewing court must then evaluate the fact finder's determination under the manifest error standard of review.[7]
In the present case, the court held as follows:
As a result of [the chairs'] placement in the parking space, it was not possible for *840 the plaintiff to see the bumper guard when she walked toward the restaurant's entrance ... No person walking through an area in which chairs for seating have been placed should reasonably expect to encounter a large immovable obstruction at just above ground level. An even greater hazard existed when chairs were placed in front of that obstruction.
On review, we find no manifest error in this determination. The testimony of Mrs. Irsch, Mrs. Schillace, and Dylon was that there were at least four chairs placed in front of the bumper guard, and Dylon added that he tripped over the bumper but was able to catch himself. Mrs. Irsch did not expect them to be there since she had just walked through other chairs without obstruction. The location of the chair arrangement was directly in front of the entrance to Harbor, and there was a ramp leading into the building located directly behind the bumper. The situation could have easily been remedied by removing the guard. We affirm the finding that the arrangement presented an unreasonable and foreseeable risk of harm.
Harbor also urges that the court erred in failing to apply the criteria of La. R.S. 9:2800.6. Under the circumstances presented here, we find the better analysis is under the negligence statutes.[8] However, even if R.S. 9:2800.6 is applied, the burden of proof is similar, requiring findings of an unreasonable risk of harm, prior knowledge, and failure to exercise reasonable care. An added component requires the claimant to prove that the condition existed for such a period of time that it would have been discovered if the merchant had exercised reasonable care. The presence of an employee of the merchant in the vicinity in which the condition exists does not, alone, constitute constructive notice, unless it is shown that the employee knew, or in the exercise of reasonable care should have known, of the condition. The requirements were met in the instant case. Restaurant personnel testified that the chairs were regularly placed there on weekends to accommodate overflow crowds and free interior space, and they were generally arranged in a horseshoe shape. They were aware that customers moved them around when they sit in them, and that it was the duty of the hostess to re-configure the chairs. Mrs. Irsch and Dylon testified that the hostess, who did not appear at trial, was at the front door. A reasonably prudent restaurant employee should have observed the misalignment of the chairs and the danger they imposed. Under either analysis, Mrs. Irsch carried her burden of proof.
Harbor avers that the court erred in failing to assign comparative negligence to Mrs. Irsch, contending that difficulty in walking and poor eyesight caused or contributed to the accident. The court found that although Mrs. Irsch suffered some visual impairment, her vision was not so impaired that she would not have been able to see the bumper had it not been obstructed by the chairs.
The appellate courts determination of whether the trial court was clearly wrong in its allocation of fault is guided by the factors set forth in Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 974 (La.1985). In Watson, we said "various factors may influence the degree of fault assigned, including:
(1) [W]hether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, *841 (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties."[9]
The court found that it was the placement of the chairs, not Mrs. Irsch's eyesight, which caused the accident. In so doing, the court apparently placed a great deal of weight on the testimony of Mrs. Irsch and her family relative to her abilities and we find no abuse in the exercise of the court's discretion. Vis-à-vis the opinions of her doctors, Mrs. Irsch stated that she her vision changed and on some days, she could see well and on others days could not. Applying the above factors to the entire record, we conclude that if Dylon, whose eyesight is not questioned, could trip over the concealed guard, it is reasonable to assume that Ms. Irsch's vision did not play a role in causation. Additionally, Harbor urges that Mrs. Irsch needed assistance in walking, and refers to her statements to Mr. George, as well as to the testimony of Ms. Carter, the latter of whom the court found to be "somewhat credible." However, the court found, after reviewing the evidence, that the medical testimony indicated that Mrs. Irsch had recovered from her prior injuries and that "Orthopedically, her gait at the time of the accident was normal." The testimony of Dr. Parnell, as well as that of Mrs. Irsch and her family, supports this conclusion. Again, the determination of the court to accept or reject evidence, and to assess credibility, is an exercise of discretion, and the record discloses no abuse of that discretion.
Harbor urges that the court erred "when transferring the amount awarded plaintiff for pain and suffering from its Reasons for Judgment ($36,000.00) to the Judgment itself ($36,500.00)." In this regard we note that appeals are taken from the judgment, not the written reasons for judgment. On appeal, we review judgments and, where the court of appeal believes that the trial court reached the proper result, the judgment will be affirmed.[10] Harbor does not argue that the sum awarded in the judgment was excessive. This assignment of error is without merit.
Finally, Harbor argues that the court failed to recognize the privilege in favor of Medical Center of New Orleans (Charity Hospital) for its medical expenses. Medical Center of New Orleans did not intervene in these proceedings, but the record discloses that it perfected its privilege for such expenses, created in La. R.S. 9:4752, upon notification to Harbor's counsel, in accordance with R.S. 9:4753. The parties stipulated to the lien in the amount of $11,476.02. Under R.S. 9:4754:
Any person who, having received notice in accordance with the provisions hereof, pays over any monies subject to the privilege created herein, to any injured person, or to the attorney, heirs, or legal representatives of any injured person, shall be liable to the licensed health care provider, hospital, or ambulance service having such privilege for the amount thereof, not to exceed the net amount paid.
Although R.S. 9:4752 grants a privilege on the judgment, and it has been *842 held that "the judgment is a property right owned by the tort victim-patient, the tort victim-patient is the debtor of the health care provider for purposes of the privilege,"[11] the above statute appears to place liability on Harbor if the medical expenses are paid to Mrs. Irsch. Harbor thus has standing to raise the issue. The lien in favor of Medical Center of New Orleans should have been recognized by the court for the stipulated amount of expenses, and we therefore amend it accordingly.
For the foregoing reasons, the judgment of the trial court is amended to recognize the lien of Medical Center of New Orleans in the amount of $11,476.02. In all other respects, the judgment is affirmed. Harbor is taxed with all costs of this appeal.
AFFIRMED.
NOTES
[1] Pollet v. Louisiana Farm Bureau Cas. Ins. Co., 99-208 La.App. 5 Cir. 7/27/99, 751 So.2d 925, writ denied 99-2877 (La. 12/10/99), 751 So.2d 857.
[2] Benoit v. Allstate Ins. Co., XXXX-XXXX (La. 11/28/00), 773 So.2d 702.
[3] Burse v. Allstate Ins. Co., 00-1895 (La.App. 5 Cir. 3/28/01), 783 So.2d 548
[4] Keener v. Mid-Continent Cas., 01-1357 (La. App. 5 Cir. 4/30/02), 817 So.2d 347, writ denied XXXX-XXXX (La.9/20/02) 825 So.2d 1175.
[5] Calcagno v. Kuebel, Fuchs Partnership 01-691 (La.App. 5 Cir. 11/14/01, 802 So.2d 746). 802 So.2d 746; Gray v. DOTD, 00-7 (La.App. 5 Cir. 5/17/00), 761 So.2d 760, writ denied, 00-2369 (La. 11/03/00), 773 So.2d 146.
[6] Id.
[7] Calcagno, supra, citing Reed v. Wal-Mart Stores, Inc., 97-1174 (La.3/4/98), 708 So.2d 362, 364-365.
[8] See e.g. Calcagno, supra.
[9] Duncan v. Kansas City Southern Railway Co., XXXX-XXXX La. 10/30/00, 773 So.2d 670.
[10] Mason v. Kansas City Southern Ry. Co., 00-208 (La.App. 5 Cir. 9/26/00), 769 So.2d 1249.
[11] Nicholes v. St. Helena Parish Police Jury 604 So.2d 1023, (La.App. 1 Cir.1992).