WALTER J. ROTHSCHILD, Judge.
| ¿Plaintiffs, Cora and Ronald Vega, individually and on behalf of their minor child, Ryan Vega,[1] appeal the May 11, 2006 trial court judgment rendered in accordance with the jury verdict, as well as the trial court’s February 2, 2007 judgment denying their Motion for Judgment Notwithstanding the Verdict, or in the Alternative, for Additur as Alternative for New Trial.[2] For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY

This case arises from a motor vehicle accident that occurred on August 26, 1997. Cora Vega was operating her Dodge Caravan westbound on West Esplanade Avenue in Metairie, when her vehicle was struck by a vehicle driven by James Migliaccio. At the time of the accident, Cora’s son, Ryan Vega, was a passenger pin her vehicle. Mr. Migliaccio was insured by State Farm Mutual Automobile Insurance Company (“State Farm”), and it was undisputed that Mr. Migliaccio was solely at fault for the accident. In August 1998, State Farm paid $10,000 each to Cora and Ryan for their injuries, which exhausted Mr. Mi-gliaccio’s policy limits.
Cora Vega and her husband, Ronald Vega, had an insurance policy with State Farm which provided $100,000/$300,000 per person/per accident uninsured/under-insured motorist coverage and $5,000 per person medical payments coverage. On August 24, 1999, plaintiffs filed suit against State Farm seeking to recover damages for the injuries sustained by Cora and Ryan in the accident. Thereafter, Cora and Ryan were each paid $5,000 by State Farm under the medical payments coverage of the policy, as well as additional tenders of funds for their damages.
A jury trial was held on January 17, 18, 19, and 20, 2006, with the remainder of the State Farm policy limits at issue. On January 20, 2006, the jury rendered a verdict, and the trial judge signed a judgment on May 11, 2006 in accordance with the jury’s verdict. The judgment provided that Cora Vega sustained damages as a result of the August 26, 1997 accident and awarded Cora $87,500 in general damages, $11,000 in medical expenses, and $1,500 in lost wages,[3] subject to a credit in favor of State Farm for sums already paid for Cora’s injuries. The judgment further provided that Ryan Vega was injured as a result of the accident, and awarded $10,000 in general damages and $2,500 [4] in medical expenses for Ryan’s injuries, subject to a credit in favor of State Farm for monies previously tendered for Ryan’s injuries. The jury found that Ronald Vega did not sustain loss of consortium due to Cora’s injuries and neither Ronald Vega nor Cora Vega |4sustained loss of consortium due to *1167 Ryan’s injuries, so the trial court’s judgment dismissed their consortium claims.
On May 22, 2006, plaintiffs filed a Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for Additur as Alternative to New Trial, in which they claimed that Cora should have been awarded the full amount of her actual medical expenses, Ryan should have been awarded the full amount of his medical expenses and additional general damages, Ronald should have been awarded loss of consortium due to Cora’s injuries, and both Ronald and Cora should have been awarded loss of consortium damages due to Ryan’s injuries. On May 23, 2006, State Farm filed a Motion for New Trial or Alternatively, Remittitur, seeking a reduction in the general damages awarded to Cora. A hearing was held on these post-trial motions and, on February 2, 2007, the trial judge signed a judgment denying plaintiffs’ Motion for Judgment Notwithstanding the Verdict as to all claims, except the loss of consortium claim by Ronald Vega for Cora Vega’s injures which was granted and Ronald Vega was awarded $7,500. State Farm’s Motion for New Trial or Remittitur and plaintiffs alternative Motion for Additur were denied. Plaintiffs now appeal.

LAW AND DISCUSSION

On appeal, plaintiffs assert three assignments of error, along with other unenu-merated arguments. In their first assignment of error, plaintiffs contend that the jury and the trial court were manifestly erroneous in awarding Cora Vega $11,000 in medical expenses instead of the full amount of her medical expenses, i.e. 21,-597.73. They claim that there was no countervailing evidence presented by defendant to contradict her claim that the accident caused her to suffer an aggravation of her pre-existing left shoulder injury, injuries to her cervical musculature and disc bulges at several levels of her cervical spine, low back |injuries, right shoulder injuries necessitating surgery to her right shoulder, and lacerations to her scalp. Therefore, because the medical expenses were incurred to treat these injuries, plaintiffs claim that Cora was entitled to recover the full amount of her medical expenses.
State Farm responds that plaintiffs failed to prove that- all of Cora’s injuries, particularly the right shoulder injury which resulted in surgery, were caused by the accident. Therefore, State Farm contends that the jury was not manifestly erroneous or clearly wrong in awarding only $11,000 in medical expenses for Cora’s injuries. We agree with State Farm.
The parties do not seem to dispute that Cora injured her neck, left shoulder, and lower back in the accident and that she received treatment for these injuries through July 15, 1998. The primary question in dispute is whether or not Cora’s right rotator cuff or shoulder was injured as a result of the accident.
At trial, Dr. Timothy Finney, an expert in orthopedic surgery, testified that he performed arthroscopic surgery on Cora’s left shoulder on August 5, 1997. After the August 26, 1997 accident, he treated Cora for injuries to her neck and lower back, and for an aggravation of her left shoulder injury. Dr. Finney treated Cora for these injuries until July 1998. Although he testified that Cora complained of pain in the cervicotrapezial region on the right side, which is part of the neck and shoulder area, and some soreness over her right shoulder, he stated that Cora did not complain of right rotator cuff pain after the accident. It was not until July 3, 2000 that Cora saw Dr. Finney with complaints of pain in the right shoulder rotator cuff area. Dr. Finney testified that an MRI was taken and it showed some right shoulder impingement and some degenerative *1168 changes in the right rotator cuff with some fraying. Dr. Finney performed arthroscopic surgery on Cora’s right shoulder in August 2000. Dr. Finney admitted on cross examination that there was | ^no injury to Cora’s right rotator cuff that he could determine at her initial visit after the accident. He opined that Cora’s right shoulder injury could have been caused by trauma or it could have been secondarily related to the accident due to overuse of the right shoulder to compensate for the injury to her left shoulder.
In a personal injury action, plaintiff must prove by a preponderance of the evidence that the claimed injuries resulted from accident at issue. Bruce v. State Farm Ins. Co., 37,704, p. 6 (La.App. 2 Cir. 10/29/03), 859 So.2d 296, 302. The test for determining the causal relationship between the accident and subsequent injury is whether plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident. Maranto v. Goodyear Tire & Rubber Co., 94-2603, (La.2/20/95), 650 So.2d 757, 759. The determination of causation and extent of a plaintiffs injuries are questions of fact. Rosell v. ESCO, 549 So.2d 840 (La.1989). Methvin v. Ferguson, 35,138, p. 8 (La.App. 2 Cir. 9/26/01), 796 So.2d 712, 718. A court of appeal may not set aside a jury verdict or trial court’s findings of fact in the absence of manifest error or unless it is clearly wrong. Stobart v. State, Department of Transp. and Dev., 617 So.2d 880, 882 (La.1993).
In the present case, it appears that the jury did not believe that Cora’s right rotator cuff injury and subsequent surgery were related to the accident. The award of $11,000 was sufficient to cover Cora’s medical expenses through July 1998. This award was reasonable if the jury did not believe that the medical bills incurred after July 1998 were related to the accident.
Based on the record before us and the applicable law, we find that the jury’s award of $11,000 in medical expenses was not clearly wrong or manifestly erroneous. Dr. Finney’s treatment of Cora after the accident continued until July 15, 1998, and she did not see him again for any injuries allegedly related to the |7accident until July 3, 2000 when she first complained of pain in the right rotator cuff area. Considering the gap in treatment, the testimony at trial, and the medical records, it was not unreasonable for the jury to conclude that Cora failed to meet her burden of proving that her right rotator cuff injury and surgery were caused by the August 26, 1997 accident. We find no error in the jury’s award of $11,000 in medical expenses for Cora’s injuries.
 A judgment notwithstanding the verdict (JNOV) is the procedural device authorized by LSA-C.C.P. art. 1811 whereby the trial court may correct a legally erroneous verdict by modifying fault or damages, or both, that the jury may have assessed. Kose v. Cablevision of Shreveport, 32,855, p. 5 (La.App.2d Cir.4/5/00), 755 So.2d 1039, 1045, writs denied, 00-1177, 00-1289 (La.6/16/2000), 764 So.2d 964, 765 So.2d 340. JNOV is a question of whether the jury verdict, as matter of law, is supported by any legitimate or substantial evidence. To determine that the evidence was insufficient as a matter of law requires a finding that no valid line of reasoning and permissible inferences could possibly lead rational persons to the conclusions reached by the jury. Id.
Based on our determination that the jury’s award of medical expenses to Cora was reasonable, we find no error in the trial court’s failure to grant a JNOV on the issue of Cora’s medical expenses. Accordingly, this assignment of error is without merit.
*1169 In their second assignment of error, plaintiffs assert that the jury and the trial court were manifestly erroneous in awarding $2,200 for Ryan Vega’s medical expenses, instead of his actual medical expenses, which were $22,279.26. They further contend that the general damage award of $10,000 was manifestly erroneous because it is clearly inadequate to compensate him for his injuries, including the aggravation to his pre-existing right wrist injury that necessitated | Ssurgery to be performed in February 1999. Plaintiffs argue that the testimony of Dr. Stokes and Dr. Faust was more credible than Dr. Bennett’s testimony.
State Farm responds that there were many factors that contributed to Ryan’s wrist condition, which pre-existed the August 26, 1997 accident. It asserts that Ryan was a candidate for surgery prior to the accident, so the accident was not the cause of the surgery. Further, State Farm contends that it was reasonable for the jury only to award approximately 10% of Ryan’s medical expenses, because the accident only contributed to a small amount of the medical expenses.
At the time of the accident, Ryan was 13 years old. Previously, in 1993, Ryan fractured his right radius while playing football. In 1994, he injured his wrist again when he slid into base while playing baseball. Dr. James Bennett, an expert in pediatric orthopedics, first saw Ryan in October 1995 for complaints of a painful stiff right wrist. At trial, Dr. Bennett testified that he ultimately determined in 1995 that Ryan’s wrist pain was caused by Kienbock’s disease, which was described at trial as a loss of blood supply to the lunate bone in the wrist which causes pain and swelling. According to Dr. Bennett, with Kienbock’s disease, there are periods of devascularization and revascularization of the lunate bone, and there are times when a patient can be pain-free and other times when the symptoms flare up.
Dr. Bennett saw Ryan in 1995, 1996, and 1997 for his wrist condition. The accident at issue in this case occurred on the evening of August 26, 1997. That morning, before the accident, Ryan saw Dr. Bennett, and Dr. Bennett testified that Ryan came in that morning complaining of wrist pain. Dr. Bennett stated that x-rays were taken that morning, which showed arthritis or degenerative changes. Dr. Bennett testified that on August 26, 1997, he started thinking that Ryan was old enough for surgery on his wrist and that such surgery would be necessary. He Rstated that he had previously discussed with the Vegas the possibility that Ryan would need surgery when he was older, but he did not recall whether or not he discussed surgery with Ryan and his father, Ronald, on August 26, 1997. Dr. Bennett’s notes from the August 26, 1997 visit state, “I suspect he may come to having further surgery.”
When Ryan saw Dr. Bennett after the accident on September 5, 1997, Ryan had a stiff wrist with swelling and pain. Dr. Bennett discussed surgery options with the Vegas that day. He believes the accident aggravated Ryan’s wrist condition, but he thinks it was just one of multiple episodes causing Ryan’s wrist pain. He testified that any microtraumas to the wrist in daily life would play some role in advancing the disease process, because Ki-enbock’s disease by nature is not caused by a single trauma. He believes the accident played only a minor role in Ryan’s wrist condition, possibly 1%, and he was certain that Ryan needed surgery even before the accident.
Although plaintiffs contend in their brief that Dr. Bennett only saw less than 10 Kienbock’s cases in his career, Dr. Bennett actually testified that he had seen over 100 Kienbock’s cases, but only 10 in Ryan’s *1170 age group. When Dr. Bennett saw Ryan for the last time on June 19, 1998, Ryan indicated that he was not really hurting.
Dr. William Faust, a board certified orthopedist with a specialty in hand surgery, testified at trial via his deposition. He testified that there are four stages of Kien-bock’s disease, which is a progressive and degenerative disease that can be caused by trauma. Dr. Faust saw Ryan on only one occasion, September 9, 1997, which was shortly after the accident, and he had no independent recollection of the visit. According to Dr. Faust, he was given a history of Ryan’s condition, including information that Ryan had fractured his wrist while playing football in 1l01993. He was told that Ryan was diagnosed with Kien-bock’s disease and that surgery to lengthen the ulna was contemplated. His notes indicate that Ryan’s painful wrist condition increased within three weeks earlier and that he was in an accident two weeks earlier which aggravated his discomfort. Based on Ryan’s complaints, Dr. Faust opined that the accident aggravated Ryan’s condition.
Dr. Faust did not recommend surgery at the time of Ryan’s visit. He admitted that devascularization of the lunate bone can become apparent up to one year after a traumatic event, and he believes that Ryan’s subsequent devascularization could have been related to the accident, but he did not have enough information to say for certain. He believes that the accident could have made a small or large contribution to Ryan’s wrist condition.
Dr. Harold Stokes, an expert in orthopedic surgery with a specialty in hand surgery, testified that Kienbock’s disease can occur with or without trauma. He first saw Ryan on January 5, 1998 and got a history from Ryan and his parents, including Ryan’s football and baseball injuries and Dr. Bennett’s diagnosis of Kienbock’s disease in 1995. Ryan indicated that he had increased wrist pain at the time of the accident, but at the January 5, 1998 visit, he did not have significant pain. Dr. Stokes agreed with Dr. Bennett’s diagnosis of Kienbock’s disease, but he did not recommend surgery at that time, because Ryan was not having enough symptoms.
Dr. Stokes saw Ryan again on January 18, 1999, and Ryan indicated that he had had no trouble with his wrist until three days earlier when he had pain and swelling in his wrist. At that time, x-rays showed an abnormally shaped lunate and that Ryan was developing a SLAC wrist deformity. Ryan returned to see Dr. Stokes on February 9, 1999 complaining of continuing pain and swelling. At that Intime, the Vegas agreed to a radial shortening operation and Dr. Stokes performed this surgery on February 18,1999.
Dr. Stokes opined that there were three significant events causing Ryan’s wrist condition; 1) his 1993 wrist fracture while playing football; 2) his 1994 wrist injury while playing baseball; and 3) the August 26, 1997 motor vehicle accident. He believes that the accident was a significant event causing an increase in Ryan’s Kien-bock’s disease. He stated that it is not unusual for the devascularization process caused by trauma to not show up until a year later or longer. He believes that the accident ultimately precipitated Ryan’s need for surgery. On cross examination, Dr. Stokes admitted that throughout the Kienbock’s process, the symptoms can flare up and settle down frequently. He was not certain which of the three significant events caused the most damage to Ryan’s wrist. He admitted that flare ups can happen and arthritis can progress without any traumatic event.
Ronald Vega testified that he had conversations with Dr. Bennett before the accident about surgery, but only as a last resort and only as a possibility when Ryan *1171 was older. He testified that Dr. Bennett did not mention surgery on the morning before the accident and that Ryan only went to see Dr. Bennett that day to see if there was any problem with him swimming in a school swim meet that evening, not because he had any pain.
Ryan Vega testified and admitted that he had flare ups of pain and swelling in his wrist before the accident and he always knew he would have arthritis. He stated that he did not have any significant pain in January 1998 when he saw Dr. Stokes, but the pain started again sometime between August 1998 and January 1999.
William Naquin, a physical therapist, treated Ryan in 1995 and 1996 for wrist pain. In September 1997, Ryan came back for treatment, complaining of an 112inability to move his right wrist or lift things with it. After the accident, Mr. Naquin treated Ryan from September 17, 1997 through December 31, 1997 for wrist pain.
Expert testimony may be evaluated by the same principles that apply to other witnesses, and the trier of fact has great discretion to accept or reject a medical or lay opinion. Irsch v. Argonaut Great Cent. Ins. Co., 02-988 (La.App. 5 Cir. 1/28/03), 841 So.2d 831, 839. The weight to be accorded to testimony of experts depends largely on their qualifications and the facts on which they base their opinions. Id. The factfinder should make determinations regarding the credibility of witnesses and respect should be given to those conclusions. Mosley v. Pennzoil Quaker State, 37,199, p. 5 (La.App. 2 Cir. 7/23/03), 850 So.2d 1100, 1103, writ denied, 03-2412 (La.11/21/03), 860 So.2d 553.
In the present case, the jury was presented with the testimony of Dr. Bennett, who opined that the accident played only a minor role in Ryan’s wrist condition and stated that he knew on the morning before the accident that Ryan needed surgery. Dr. Stokes, on the other hand, testified that he believed the accident was a significant event that caused an increase in Ryan’s Kienbock’s disease and ultimately precipitated his need for surgery. After the accident, Ryan went to physical therapy from September 17, 1997 through December 31, 1997. When he saw Dr. Stokes in January 1998, Ryan was no longer having significant pain in his wrist and he did not see Dr. Stokes again until January 1999. After the jury considered the testimony of the doctors and all of the witnesses, they apparently concluded that the accident did not play a significant role in Ryan’s wrist condition or need for surgery.
The medical expenses awarded by the jury for Ryan’s injuries, $2,200, were sufficient to cover Ryan’s expenses for treatment Ryan received after the accident | ^through June 1998. Based on the evidence in this case, we find no error in the award of $2,200 in medical expenses for Ryan’s injuries.
General damages are those which may not be fixed with pecuniary exactitude; instead they involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or lifestyle which cannot be definitively measured in monetary terms. Duncan v. Kansas City Southern Railway Co., 00-66, p. 13 (La.10/30/00), 773 So.2d 670, 682. In making a general damage award, the discretion of the trier of fact is great, and even vast, so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). In reviewing a damage award, we ask whether the award for the particular injuries and their effects under the particular circumstances of the *1172 particular injured person is a clear abuse of the much discretion of the trier of fact. Id.; Broussard v. Razden, 98-2576, p. 12 (La.App. 1 Cir. 12/28/99), 763 So.2d 644, 653.
The jury apparently believed that the accident only played a minor role in Ryan’s wrist condition. Therefore, the $10,000 in general damages awarded for Ryan’s injuries was not unreasonable. Considering the entire record in this matter, we find that the jury’s awards of $2,200 in medical expenses and $10,000 in general damages for Ryan’s injuries were reasonable, and we will not disturb these awards. Accordingly, we also find no error in the trial court’s failure to grant a JNOV with regard to these awards.
In their third assignment of error, plaintiffs assert that the jury and the trial court were manifestly erroneous in failing to find that Cora and Ronald Vega sustained a loss of consortium as a derivative claim of Ryan’s injuries from the accident and in failing to award damages for this loss of consortium. Plaintiffs h ¿claim in their brief that at least $25,000 in damages for loss of consortium should have been awarded to Cora and Ronald for Ryan’s injuries.
Loss of consortium in the context of a parent-child relationship means loss of the aid, assistance, and companionship of the child, or loss of affection, society, and service. Spears v. Jefferson Parish School Board, 94-0352 (La.App. 5 Cir. 11/16/94), 646 So.2d 1104, 1107. A jury’s finding regarding a claim for loss of consortium is a factual determination. Tadlock v. Taylor, 02-712, p. 13 (La.App. 4 Cir. 9/24/03), 857 So.2d 20, 31, writ denied, 03-3265 (La.3/12/04), 869 So.2d 819.
At trial, the evidence did not establish that Cora and Ronald suffered any loss of consortium for Ryan’s injuries. Therefore, plaintiffs did not meet their burden of proof and the jury’s failure to award damages for loss of consortium was not unreasonable. Based on the evidence before us, we find no error in the jury’s failure to award loss of consortium damages to Cora and Ronald for Ryan’s injuries, and no error in the trial court’s failure to grant a JNOV on this issue. Accordingly, this assignment of error is without merit.
In addition to the enumerated assignments of error, plaintiffs assert that the trial court’s judgment is improper because it fails to assess all costs of the proceedings to State Farm. We disagree.
LSA-C.C.P. art.1920 provides that, unless otherwise provided, costs shall be paid by the party cast and may be taxed by a rule to show cause. However, according to the record before us, no rule to tax costs was filed in the trial court. LSA-C.C.P. art.1920 further provides that the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable. However, we note that the trial court’s judgment is silent on the issue of costs.
11SAlthough plaintiffs claim that State Farm should be ordered to pay all costs because it was the party cast in judgment, we do not find that to be the case. The jury award for Ryan’s injuries was less than the amount previously tendered by State Farm, resulting in a net award of zero dollars in this litigation for claims regarding Ryan’s injuries. Further, Cora and Ronald Vega’s claims for loss of consortium for Ryan’s injuries were rejected by the jury. Plaintiffs did recover damages for Cora’s injuries and Ronald’s loss of consortium for Cora’s injuries. Therefore, because plaintiffs prevailed on some issues but did not prevail on other issues, they are not entitled to an order requiring State Farm to pay all costs. This argument is without merit.

*1173
DECREE

For the foregoing reasons, we affirm the trial court’s May 11, 2006[5] judgment rendered in accordance with the jury’s verdict, as well as the February 2, 2007 judgment denying plaintiffs’ Motion for Judgment Notwithstanding the Verdict. All costs of this appeal are assessed against plaintiffs.

AFFIRMED.

. At the time of trial, Ryan Vega was no longer a minor child.

. The trial judge granted plaintiffs' motion in part and awarded $7,500 to Ronald Vega for loss of consortium for injuries to his wife, Cora Vega. Plaintiffs do not appeal this portion of the judgment.

. The amount of lost wages was stipulated by the parties.

. Although the judgment states that the jury awarded Ryan $2,500 for medical expenses, the jury actually awarded Ryan only $2,200 for medical expenses.

. We note that the May 11, 2006 judgment is affirmed with the exception of the ruling dismissing Ronald Vega's claims for loss of consortium for Cora's injuries, due to the trial court’s judgment on the Motion for Judgment Notwithstanding the Verdict awarding Ronald $7,500 for loss of consortium.